Nathaniel K. Charny (NC 5664)
Amanda N. Miller
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
Tel – (845) 876-7500
Fax – (845) 876-7501
ncharny@charnywheeler.com

Attorneys for Plaintiff Derek Trivelli

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEREK TRIVELLI,<br><br>                    Plaintiff,<br><br>     v.<br><br>PUTNAM HOSPITAL CENTER, HEALTH QUEST SYSTEMS, INC. and NUVANCE HEALTH,<br><br>                    Defendants. | COMPLAINT<br><br>Civil Action No.<br><br>JURY TRIAL DEMANDED |

Plaintiff complains, upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1. This action is brought by Plaintiff Derek Trivelli ("Plaintiff") against his former employer, Defendant Putnam Hospital Center, and its parent companies, Defendants Health Quest Systems, Inc. and Nuvance Health (collectively, "Defendants").

2. Plaintiff alleges that Defendants unlawfully retaliated against him by disciplining him and then terminating him in violation of the Energy Reorganization Act ("ERA"), 42 U.S.C.

1

§ 5801, et seq. and N.Y. Lab. Law § 741 after Plaintiff engaged in protected whistleblower activities.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 5851(b)(4) and 28 U.S.C. § 1331.

4. Because Plaintiff's state law claim arises out of the same case or controversy as his Federal claim, this Court has jurisdiction over the supplemental state law claim by virtue of 28 U.S.C. § 1367(a).

5. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

6. Plaintiff Derek Trivelli is a citizen and resident of the United States of America, who is, and at all times relevant hereto was, a resident of Dutchess County, New York.

7. Defendant Putnam Hospital Center ("PHC") is a 164-bed, acute care hospital located at 670 Stoneleigh Avenue, Carmel, New York 10512.

8. Defendant Health Quest Systems, Inc. ("HQSI") is a not-for-profit corporation with headquarters located at 1351 Route 55, Suite 200, LaGrangeville, New York 12540. Defendant PHC is a wholly owned subsidiary of Defendant HQSI.

9. Defendant Nuvance Health ("Nuvance") is a not-for-profit corporation located at 1351 Route 55, Suite 200, LaGrangeville, New York 12540. Defendant Nuvance is the parent corporation to Defendant HQSI.

10. Prior to approximately April 3, 2019, Defendant HQSI was the sole parent corporation to Defendant PHC. On or about April 3, 2019, federal and state agencies approved a

$2.4 billion merger between Defendant HQSI and Western Connecticut Health Network. This merger transferred ownership of Defendant HQSI and Western Connecticut Health Network to Defendant Nuvance, a newly created parent corporation.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On December 5, 2017, Plaintiff timely filed a complaint with the U.S. Department of Labor ("the DOL") asserting his claims of retaliation.

12. According to the DOL Occupational Safety and Health Administration's ("OSHA") Whistleblower Investigations Manual, "OSHA is responsible for properly determining the statute(s) under which a complaint is filed."[1]

13. On or about July 18, 2019, OSHA <u>sua sponte</u> amended Plaintiff's complaint, without amending or altering any substantive allegations, to include a claim of retaliatory employment practices in violation of the ERA, 42 U.S.C. § 5851.

14. Over one year has passed since Plaintiff filed his complaint with the DOL, the Secretary has not issued a final decision, and any delay was not due to the bad faith of Plaintiff.

15. On October 1, 2019, Plaintiff notified the Assistant Secretary of Labor, OSHA, that he intended to file an action at law or equity for <u>de novo</u> review in this Court pursuant to 29 C.F.R. § 24.114.

16. In addition, and as required by 29 C.F.R. § 24.114, Plaintiff served such notice on Defendant HQSI (the party to the OSHA proceeding), the Regional Administrator, and the Associate Solicitor, Division of Fair Labor Standards, DOL.

17. Plaintiff has therefore exhausted his administrative remedies.

---

[1] OSHA Whistleblower Investigations Manual, p. 2-2 available at https://www.osha.gov/OshDoc/Directive_pdf/CPL_02-03-007.pdf.

SUBSTANTIVE ALLEGATIONS

Definitions

18. <u>Radiation Protection Lead Units</u>. Radiation protection lead units shield patients and personnel from unnecessary X-ray radiation exposure from diagnostic radiology procedures.

19. Radiation protection lead units are protective garments and include lead aprons, skirts, and thyroid shields.

20. Radiation protection lead units that contain holes or tears in them pose a significant safety risk to personnel and patients that are wearing them.

21. <u>Fluoroscopy</u>. Fluoroscopy is a type of medical imaging that shows a continuous X-ray image on a monitor, similar to an X-ray "movie." A continuous X-ray beam is passed through the body part being examined. The beam is transmitted to a TV-like monitor so that the body part and its motion can be seen in detail.

22. Fluoroscopy can also be used to determine the integrity of radiation protection lead units because it reveals any holes or tears in the lead.

23. <u>Ionizing Radiation</u>. According to the United States Nuclear Regulatory Commission ("NRC"), ionizing radiation is a form of radiation that includes alpha particles, beta particles, neutrons, gamma rays, and X-rays.

24. Ionizing radiation is capable of producing ions and is considerably more energetic than non-ionizing radiation such as radio- or microwaves.

25. When ionizing radiation passes through material such as living tissue, it deposits enough energy to produce ions by breaking molecular bonds and displacing (<u>i.e.</u>, removing) electrons from atoms or molecules. This electron displacement may lead to changes in living cells. Given this ability, ionizing radiation has a number of beneficial uses.

26.     However, ionizing radiation is potentially harmful if not used correctly, and high doses may result in severe skin or tissue damage.

27.     <u>Radiation Badges</u>.  Radiation badges or radiation dosimeters measure a person's occupational radiation dose.

28.     There are many different types of radiation badges and the type of badge someone wears and where someone wears it depends upon the type of work the individual does and their work environment.

29.     For example, a person may wear a body dosimeter at their chest level if she works in nuclear medicine.

30.     For another example, a person may wear a ring dosimeter, used for measuring the beta and gamma dose to their hand, on the hand which is closest to the radiation source.

31.     <u>Nuclear Medicine</u>.  Nuclear medicine is a specialized area of radiology that uses very small amounts of radioactive materials, or radiopharmaceuticals, to examine organ function and structure.

32.     Nuclear imaging is a branch of radiology that enables visualization of organ and tissue structure as well as function.

Background

33.     Plaintiff's training and educational background is in nuclear medicine technology.

34.     Plaintiff earned an Associate's Degree in Nuclear Medicine Technology from Molloy College.

35.     Plaintiff is certified by the American Registry of Radiologic Technologists in Nuclear Medicine Technology and the Nuclear Medicine Technology Certification Board.

36.     Plaintiff holds a New York State license in Nuclear Medicine Technology.

37. Plaintiff was hired by Northern Dutchess Hospital, a wholly owned subsidiary of Defendant HQSI, on July 7, 2007 as a Nuclear Medical Technologist.

38. As a Nuclear Medical Technologist Plaintiff injected nuclear isotopes into patients and used a camera, that did not emit any ionizing radiation, to view the area(s) of the body that the isotopes had traveled through.

39. As a Nuclear Medical Technologist, Plaintiff did not use radiation protection lead units.

40. On or about November 9, 2014, Plaintiff was promoted to Radiology Supervisor at Defendant PHC, a position he held until his unlawful termination on November 20, 2017.

41. As Radiology Supervisor, Plaintiff reported to Richard Hvisch, Radiology Director at Defendant PHC, and April Lividini, Radiology Manager at Defendant PHC.

42. As a Radiology Supervisor at Defendant PHC, Plaintiff's job responsibilities primarily included supervising outpatient radiology and dealing with patient complaints in that regard.

43. Plaintiff also continued, when needed, to perform his previous duties as a Nuclear Medical Technologist i.e., administering nuclear isotopes into patients.

44. However, as Radiology Supervisor, Plaintiff's job responsibilities did not include performing fluoroscopies.

45. Nor was Plaintiff ever previously asked while employed by Defendants to perform a fluoroscopy or any other type of X-ray procedure.

46. Rather, Plaintiff's expertise is in nuclear medicine (i.e., gamma radiation) not X-rays.

47. Prior to the events at issue here, Plaintiff had never used a fluoroscopy machine, was never trained on conducting fluoroscopies, was never provided training on appropriate protective gear and was never provided training on the appropriate radiation badges.

48. Plaintiff's duties and obligations under both his licensure and his assigned duties and responsibilities while employed by Defendants also included ensuring compliance with workplace safety obligations.

The Fluoroscopy Assignment:
Plaintiff Is Ordered to Perform Fluoroscopies On
All of Defendant PHC's Radiation Protection Lead Units

49. On or about September 26, 2017, Ms. Lividini assigned Plaintiff to perform fluoroscopy on all of Defendant PHC's radiation protection lead units which included hundreds of lead aprons, skirts, and thyroid shields.

50. Plaintiff believed these radiation protection lead units were used by both patients and personnel in the operating room.

51. On October 4-5, 2017, Plaintiff performed fluoroscopies on more than 100 separate radiation protection lead units.

52. This was an arduous task that he completed over two days consisting of shooting thousands of fluoroscopies on large lead units.

53. Plaintiff was not sufficiently trained in using a fluoroscopy machine.

54. Plaintiff was assisted by Patient Care Technicians ("PCTs") who were also not sufficiently trained in using a fluoroscopy machine.

55. Plaintiff's review of the lead shields through fluoroscopy revealed that a lot of them, had holes, cracks, and tears in them.

56.     In other words, the radiation protection lead units posed health and safety risks to anyone who wore them.

57.     However, safety records pertaining to these radiation protection lead units showed that they had fluoroscopies performed on them approximately six months earlier and were recorded as "aok" (i.e., showed no issues).

58.     Plaintiff knew that this was inaccurate, as fluoroscopies had not been performed on these radiation protection lead units.

Plaintiff Suffers A Physical Reaction

59.     On October 9, 2017, an unusual rash developed on Plaintiff's neck and upper back; so much so that Plaintiff went to see his primary care physician.

Plaintiff's First Protected Activity:
Plaintiff Complained to Human Resources That He Had Safety Concerns
With Respect to Performing Fluoroscopies On Radiation Protection Lead Units

60.     On October 20, 2017, Plaintiff requested a meeting with Anthony Iraola, a Human Resources Business Partner at Defendant PHC, to discuss Plaintiff's concerns regarding the fluoroscopies.

61.     The same day that this meeting took place Mr. Iraola stressed that Plaintiff openly communicate his concerns to his supervisor, Ms. Lividini, by emailing her as soon as possible.

Plaintiff's Second Protected Activity:
Plaintiff Complained to His Supervisor Regarding The Safety Of
Plaintiff Performing Fluoroscopies On Radiation Protection Lead Units

62.     On October 23, 2017 at 1:26 pm, in accordance with the instructions from Defendants' Human Resources Department, Plaintiff emailed his supervisor, Ms. Lividini, expressing his safety concerns about performing the fluoroscopies.

63. Specifically, Plaintiff (a) informed Ms. Lividini that he was "not comfortable performing the [fluoroscopies] without proper training on the machine," (b) asked Ms. Lividini if he could receive help from an X-ray Technician, someone who was properly trained in fluoroscopies, and (c) asked Ms. Lividini for guidance as to whether Plaintiff should be wearing an X-ray badge to monitor his radiation exposure levels.

64. Although Plaintiff had a radiation badge for nuclear medicine, it was Defendants' practice and/or policy that personnel who work with ionizing radiation not "mix" their badges.

65. For example, a worker should wear one badge to perform nuclear medicine and a different badge to perform an X-ray.

66. The reason for this practice is if the worker suffers an illness from radiation, he knows which type of ionizing radiation got him sick and the location in the hospital he suffered the illness.

Defendants' Own Physicist Confirms<br>Plaintiff's Fluoroscopy Assignment Was "Sketchy"

67. On October 23, 2017, the "sketchy" nature of Ms. Lividini's assignment of fluoroscopy to Plaintiff was confirmed by a text message sent from Defendants' Physicist who stated to Plaintiff that the assignment was "yes, sketchy," and articulated his bemusement that "[d]on't my guys [i.e., physicists] do it?"

Defendants' First Retaliatory Response:<br>Defendants Disciplined Plaintiff Mere Hours After He Complained<br>To His Supervisor That the Fluoroscopy Assignment Posed Safety Risks

68. On October 23, 2017 at 4:30 p.m., only hours after Plaintiff's foregoing email to Ms. Lividini, Ms. Lividini issued a "written caution/verbal warning" to Plaintiff for being unprepared for a meeting that had taken place about one week prior on October 17, 2017.

69. This was the first time Plaintiff had been subject to any negative counseling as an employee of Defendants.

70. The next morning on October 24, 2017, Ms. Lividini sent an email insisting that, notwithstanding Plaintiff's workplace safety concerns, Plaintiff was to finish all of the fluoroscopies by October 31, 2017.

<u>Plaintiff's Third Protected Activity</u>:
<u>Plaintiff Complained to Defendants' Human Resources Department
That He Was Directed by His Supervisor To Perform Fluoroscopies
On Radiation Protection Lead Units Without Proper Training or Licenses</u>

71. On October 23, 2017, Plaintiff emailed Kathryn Duras, Human Resources Director at Defendant PHC, requesting a meeting regarding the foregoing events.

72. Ms. Duras replied that she was unavailable and recommended that Plaintiff meet instead with Mr. Iraola.

73. On October 24, 2017, as instructed by Ms. Duras, Plaintiff emailed Mr. Iraola and reported to him that on October 4-5, 2017 Plaintiff performed, at Ms. Lividini's behest, fluoroscopies on over 100 lead aprons, thyroid shields, and vests which took two days and hours of fluoroscopy time despite the fact that Plaintiff did not have a New York State license to perform this task or proper radiation safety training.

74. Plaintiff further reported that without the proper licenses and training Plaintiff and the PCTs were "put into direct danger of radiation exposure," that Plaintiff believed he developed a rash as a result, and that he was never issued an X-ray radiation badge to monitor his radiation level.

75. Plaintiff reported his concern that Ms. Lividini retaliated against him by issuing him a disciplinary warning only hours after he emailed her about his safety concerns.

**Plaintiff's Fourth and Fifth Protected Activities:**
Plaintiff Met with Defendants' Human Resources Personnel And
Again Complained That He Was Directed By His Supervisor To Perform
Fluoroscopies on Radiation Protection Lead Units Without Proper Training Or Licenses

76.   On October 24, 2017, as a result of Plaintiff's foregoing email, Mr. Iraola and Ms. Duras agreed to meet Plaintiff.

77.   During this meeting, which lasted for approximately one hour, Plaintiff again complained that he was required to perform thousands of fluoroscopies on Defendant PHC's radiation protection lead units without (a) proper training on the fluoroscopy machine, (b) appropriate protective gear, and (c) training on the appropriate radiation badges.

78.   In addition at this meeting Plaintiff again expressed his concern that as a result of the foregoing, he and the other staff were likely exposed to radiation.

79.   Plaintiff also disclosed that fluoroscopies had not been performed on Defendant PHC's radiation protection lead units in years.

80.   Plaintiff also disclosed that for the prior three years he was tasked with visually inspecting the radiation protection lead units and feeling them for bumps because he was not an X-ray Technician.

81.   In this regard, Plaintiff would pull lead units out of service when they failed his visual inspection and keep records of his inspections noting whether or not a lead was in fact "aok."

82.   Plaintiff also disclosed that Ms. Lividini kept Defendant PHC's official records of the inspections of the radiation protection lead units, such records were created by Ms. Lividini without consulting Plaintiff or Plaintiff's records, such records stated that all the lead units were "aok," and that such records stated that fluoroscopies were performed on all of them even though that was not true.

83. Plaintiff also disclosed that he believed Ms. Lividini falsified official safety records with respect to the fluoroscopy checks in case New York State audited or inspected the hospital.

Plaintiff's Medical Condition Worsens And
Plaintiff's Treating Physician Needs Information

84. On October 26, 2017, Plaintiff again saw his physician because he felt fatigued, had lost weight (a loss of ten pounds in a few weeks), and his skin condition had worsened.

85. Plaintiff's physician advised Plaintiff o take leave from work until November 8, 2017 and gave Plaintiff an absence note.

86. The physician also advised Plaintiff to ask Defendant PHC for information regarding the possible radiation exposure.

87. This information – regarding the possible radiation exposure -- was readily available to Defendant PHC.

Plaintiff's Sixth Protected Activity:
Plaintiff Again Complained to Defendants' Human Resources
Department That He Was Directed by His Supervisor To Perform
Fluoroscopies on Radiation Protection Lead Units Without Proper Training Or Licenses

88. On October 26, 2017, after Plaintiff attended a doctor's appointment concerning his exposure to radiation, Plaintiff emailed Mr. Iraola and Ms. Duras complaining that Ms. Lividini's "request for me to perform testing on the lead units using fluoroscopy is beyond my scope of practice and unethical" and is a breach of Defendants' code of conduct.

89. Plaintiff also requested information regarding how much radiation he was exposed to, the health risks of radiation exposure, and Defendants' whistleblower retaliation policies.

90. Defendants never responded to Plaintiff's requests.

91. On October 30, 2017, having heard no response to his inquiry regarding radiation exposure, Plaintiff emailed Ms. Duras and Mr. Iraola writing, "I'm not sure what to do at this point, please help."

92. Mr. Iraola responded stating "At this time, we cannot share any information with you.  Upon completion of our investigation and your return to work, we will meet."

<u>Plaintiff's Health Deteriorates Further</u>

93. On November 3, 2017, Plaintiff saw his physician again because his condition had worsened.

94. At that time, Plaintiff's physician diagnosed him with probable radiation exposure.

95. Plaintiff received a doctor's note stating that he should take leave from work until November 22, 2017.

96. Plaintiff immediately emailed the doctor's note to Defendant PHC.

97. Plaintiff received no response from Defendants in regards to his doctor's note.

98. On November 9, 2017, having heard no response from Defendant PHC, Plaintiff again emailed Ms. Duras and Mr. Iraola regarding the status of his request for information including information that had been requested by Plaintiff's treating medical provider.

<u>Defendants' Second Retaliatory Response</u>:<br>
Defendants Unlawfully Terminated Plaintiff<br>
<u>Because He Engaged in Protected Whistleblower Activities</u>

99. On November 9, 2017, Defendant PHC informed Plaintiff that no information will be forthcoming and, remarkably, that Plaintiff's inquiries constituted interference with the investigation.

100.   On November 13, 2017, Plaintiff and Defendant PHC exchanged emails regarding benefits during Plaintiff's medical leave of absence, concluding with Plaintiff asking explicitly that corporate compliance be included in the investigation, especially given Ms. Lividini's alleged falsification of safety records.

101.   On November 16, 2017, as required by Defendant PHC, Plaintiff visited his physician to obtain an authorization to return to work on November 21, 2017.

102.   On November 20, 2017, the day before Plaintiff's expected return to work, Plaintiff was called into Defendant PHC and summarily terminated from employment.

103.   Defendant PHC explicitly stated, at the time that Plaintiff's discharge was because of his protected whistleblower activities.

104.   Defendant PHC's contemporaneous written explanation is as follows:

> On October 24, 2017, Derek Trivelli made a complaint to H[uman]R[esources], accusing April Lividini of requiring him to perform fluoroscopy tests on lead protective gear, which Derek stated was against his scope of practice. After a full investigation, it has been determined that Derek's complaints were not substantiated. Additionally, he falsified statements with regards to not being equipped to perform the task and not being properly trained in Radiation Safety. Derek violated H[ealth]Q[uest] Policy Rules of Conduct, Section B: Violations Resulting in Suspension and/or Immediate Discharge (Major Violations). Derek failed to be truthful regarding the investigation of his complaints. Derek continued to be disruptive and interfere with the investigation after being told multiple times he needed to stop continually calling HR and other Health Quest personnel making demands related to the investigation.

### Defendants Considered Plaintiff to Be An Exemplary Employee Until He Engaged in Protected Whistleblower Conduct

105.   Plaintiff was an exemplary employee and was recognized as such through September 2017, mere weeks before Plaintiff engaged in protected whistleblower conduct resulting in his unlawful termination.

106. For example, on or about November 2, 2016, Peter Kelly, President of Defendant PHC stated "Good progress.  Let's keep it up.  Thank you all." in response to a patient's positive satisfaction report in which the patient commended Plaintiff's "outstanding job."

107. On or about April 19, 2017, a patient called because she "wanted PHC and the necessary people to know just how [Plaintiff] has 'gone out of his way to accommodate' her and her needs" and wanted to "extend her 'many thanks for all his hard work!'"  Plaintiff again received praise from Mr. Kelly who emailed him stating "Good news and nicely done Derek.  Thank you!"

108. For another example, on or about July 19, 2017, a patient, who is a nurse herself, emailed Mr. Hvisch stating, among other positive things, that Plaintiff is "a tremendous asset to the organization."

109. As a final example, on or about September 25, 2017, Plaintiff received "employee recognition" for "exemplary patient care."

FIRST CAUSE OF ACTION

RETALIATION IN VIOLATION OF THE
ENERGY REORGANIZATION ACT, 42 U.S.C. § 5851

110. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

111. An "agreement State" is a State that has signed an agreement with the NRC authorizing the State to regulate certain uses of radioactive materials within the State.

112. New York is an agreement State.

113. Defendant PHC possesses New York State Department of Health Radioactive Materials License Number 1074.  Thus, Defendant PHC is an "employer" as defined by 42 U.S.C. § 5851(a)(2)(A) because it is a licensee of New York, an agreement State.

114. Plaintiff's acts in reporting and disclosing safety non-compliances, violations, irregularities, and/or concerns constitute actions to carry out the purposes of the ERA.

115. Accordingly, such acts are protected activities under the Energy Reorganization Act, 42 U.S.C. § 5851.

116. Defendants had knowledge of the foregoing protected activities.

117. Such protected activities were a contributing factor in the adverse and unfavorable actions Defendants took against Plaintiff including, but not limited to, a disciplinary notice and termination.

118. As a result of the foregoing, Plaintiff was subjected to retaliation in violation of the ERA, 42 U.S.C. § 5851(a) and has suffered, and will continue to suffer, emotional harm including loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, injury to reputation, fear, anxiety, and humiliation.

119. In addition, Plaintiff has suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities.

120. Plaintiff is entitled to actual, general and compensatory damages, such amount to be determined at trial.

121. Defendants should be ordered to cease all retaliatory actions towards Plaintiff.

122. Defendants should be ordered to undertake training of their management on how to prevent retaliatory actions against whistleblowers, on the need to permit employees to speak out for safety issues, and on how to avoid creating a chilling work environment regarding safety.

123. Defendants should be ordered to expunge negative performance evaluations or other negative information that was placed in Plaintiff's personnel files or the files of Defendants in retaliation for the protected whistleblower activities alleged herein.

## SECOND CAUSE OF ACTION

### RETALIATION IN VIOLATION
### OF NEW YORK LABOR LAW § 741

124. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

125. At all relevant times, Plaintiff was employed by Defendant PHC and performed health care services for and under the direction and control of Defendants within the meaning of N.Y. Lab. Law § 741(1)(a).

126. At all relevant times, Defendants are "employers" as defined by N.Y. Lab. Law § 741(1)(b).

127. Plaintiff repeatedly reported and disclosed Defendants' safety non-compliances, violations, and/or irregularities to his supervisors and human resources personnel.

128. Plaintiff also repeatedly objected to same.

129. Plaintiff notified his supervisors and human resources personnel about Defendants' safety non-compliances, violations, and/or irregularities because he reasonably believed, in good faith, that the foregoing constituted improper quality of patient care.

130. Such safety non-compliances, violations, and/or irregularities constituted violations of, among other law, rules and/or regulations, 10 N.Y.C.R.R §§ 16.5(f) and 16.11(a)-(b).

131. Plaintiff's actions to notify his supervisors and human resources personnel about such improper quality of patient care and safety at Defendant PHC afforded Defendants a reasonable opportunity to correct the activities, policies, or practices.

132. As a result of Plaintiff's acts in disclosing and objecting to Defendants' improper quality of patient care, Defendants took retaliatory actions against Plaintiff including, but potentially not limited to, discipline and termination in violation of N.Y. Lab. Law § 741(2).

133. Plaintiff is thereby entitled to (a) reinstatement to the same position held before the retaliatory personnel action, or to an equivalent position, (b) reinstatement of full fringe benefits and seniority rights, (c) compensation for lost wages, benefits and other remuneration, and (d) payment of reasonable costs, disbursements, and attorney's fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

(A) For actual, compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial;

(B) For punitive damages;

(C) For a medical monitoring program;

(D) For equitable remedies, including removal of retaliatory disciplinary actions and all records of such actions, and training for management;

(E) For attorney's fees and costs pursuant to statute;

(F) For pre- and post-judgment interest on all amounts claimed; and

(G) For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: Rhinebeck, New York
October 25, 2019

_____
Nathaniel K. Charny (NC 5664)
Amanda N. Miller
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
T - (845) 876-7500
F - (845) 876-7501
ncharny@charnywheeler.com

Attorneys for Plaintiff Derek Trivelli